2022 UT App 50

## THE UTAH COURT OF APPEALS

TIMOTHY MAHONEY,
Petitioner,

*v.*

DEPARTMENT OF WORKFORCE SERVICES AND TROON GOLF LLC,
Respondents.

Opinion
No. 20200884-CA
Filed April 14, 2022

Original Proceeding in this Court

Timothy Mahoney, Petitioner Pro Se

Amanda B. McPeck, Attorney for Respondent
Department of Workforce Services

JUDGE JILL M. POHLMAN authored this Opinion, in which JUDGES
RYAN M. HARRIS and RYAN D. TENNEY concurred.

POHLMAN, Judge:

¶1      Timothy Mahoney seeks judicial review of a Workforce
Appeals Board (the Board) decision denying him unemployment
insurance benefits. Mahoney contends that the Board "ignored
evidence and testimony," "assumed facts not in evidence," and
"made conclusions that are contradictory to evidence and
testimony." We set aside the Board's decision and instruct it to
reconsider Mahoney's claim.

BACKGROUND[1]

¶2 Mahoney was employed by Troon Golf LLC (Employer) as a general manager of its resort property in St. George, Utah. The property is made up of twenty-eight individual bungalows, with one bungalow functioning as a welcome center where guests check in. In March 2020, because of the COVID-19 pandemic, the welcome center was closed to outside guests and the resort instead provided contactless check-in and check-out. It also eliminated "same-day turnovers" so that "a sanitation worker [could] disinfect the bungalows before [the] housekeeping staff cleaned and prepared them for other customers."[2] This adjustment "lowered the risk of [the] housekeeping staff being exposed to the COVID-19 virus." During this time, Mahoney provided masks for himself and his co-workers, but "guests and owners were not required to wear masks." In addition, the

---

1. In reviewing a decision of the Board, we recite the facts in the light most favorable to the Board's findings. *Utah Paiute Tribal Housing Auth. Inc. v. Department of Workforce Services*, 2019 UT App 191, ¶ 2 n.1, 454 P.3d 865. "But we present conflicting evidence to the extent necessary to address the issues raised on [review]." *See Lundahl Farms LLC v. Nielsen*, 2021 UT App 146, ¶ 2 n.2, 504 P.3d 735; *see also Carbon County v. Department of Workforce Services*, 2012 UT App 4, ¶ 9, 269 P.3d 969 ("In applying the substantial evidence test, we review the whole record before the court, and consider both evidence that supports the Board's findings and evidence that fairly detracts from them." (cleaned up)), *aff'd sub nom. Carbon County v. Workforce Appeals Board*, 2013 UT 41, 308 P.3d 477.

2. Having a "same-day turnover" means that one guest will check out of a bungalow on the same day another guest checks in. Same-day turnovers increase occupancy rates but shorten the time available for cleaning staff to prepare the units for new guests.

sanitation worker used "a Tyve[k] suit, gloves and a face shield" as well as a "disinfectant fogger."[3]

¶3      Near the end of May 2020, Employer instructed Mahoney to "return to same-day turnovers for rooms." Mahoney did not want to disinfect rooms "moments after" guests left, nor did he "want to have to order someone to do that." Mahoney claimed that as same-day turnovers increased, the responsibility for disinfecting rooms "would fall more and more on" him instead of the sanitation worker. Mahoney was concerned that these changes could unnecessarily expose him and his staff to COVID-19. He was also worried about contracting the disease and potentially infecting his wife, whose medical condition placed her at an increased risk of serious illness if she contracted COVID-19.

¶4      At the same time, Employer "insisted" that Mahoney reopen the welcome center. Accordingly, Mahoney worked to ensure that the welcome center "had all the proper precautions in place," like "[f]loor signage for social distancing" and the installation of plexiglass between the guests and the front-desk employee. However, Employer demanded that Mahoney open the welcome center to guests in June 2020, before those precautions were in place. Specifically, the plexiglass was not "in place when [Employer] insisted the welcome center be open" and there is no evidence in the record that the floor signage had arrived. Further, D.H., "the manager of the owner organization," entered the welcome center "on an almost daily basis," "refused

---

3. The Board found that Employer provided its employees with "N100 masks, Tyvek suits, face shields, and professional-grade foggers." While Mahoney testified about an N100 mask, Tyvek suit, face shield, and disinfectant fogger that he (on one occasion) and the sanitation worker used to disinfect the units, there is no evidence in the record that Employer provided multiple face shields, Tyvek suits, and foggers, or that such equipment was generally available to all employees.

to wear a mask," and "failed to properly social distance." He also ignored Mahoney's request that when they were together he "step away and please wear a mask."

¶5     Mahoney was concerned about re-opening the welcome center because guests came "from all over the country including places that still had stay-at-home orders in effect and . . . places that were considered hot spots for COVID." He was also specifically concerned about D.H., who would not wear a mask or socially distance even after returning from traveling to a "high-risk area[]."

¶6     Although Mahoney did not tell Employer he was considering quitting, he expressed "extreme displeasure" and "strong objections" to reopening the welcome center and resuming same-day turnovers. Employer was not receptive to these concerns and moved forward with its plans. As a result, Mahoney quit and began looking for another job.

¶7     Following his resignation, Mahoney filed a claim for unemployment insurance benefits. The Utah Department of Workforce Services denied his claim, finding that Mahoney failed to "establish good cause for leaving." Mahoney appealed the denial and, after a hearing,[4] the denial was affirmed by an Administrative Law Judge (the ALJ). The ALJ determined that Mahoney had "not shown he faced an unpreventable harm by remaining at work, and ha[d] not met his burden of proving he had good cause to voluntarily end his employment." Further, the ALJ declined to award Mahoney benefits under the equity and good conscience standard because "[i]t was not reasonable or practical for [him] to quit his job to pursue employment where his risk of contracting COVID-19 would be the same or greater than the risk he faced by continuing to work for the Employer," and

---

4. Mahoney was the only witness to testify at the hearing. Employer chose not to appear.

because Mahoney's "decision to quit did not involve any mitigating circumstances suggesting a denial of benefits was an affront to fairness."

¶8      Mahoney appealed the ALJ's decision to the Board. The Board upheld the ALJ's decision, explaining that Mahoney "failed to produce persuasive evidence that remaining employed created a hardship outside of his control." And while the Board was "sympathetic" to Mahoney's health-related concerns, it also found that the "denial of benefits is not an affront to fairness" because the "decision to quit and look for other work in this field—where he does not seem likely to find anything appreciably safer—was not logical, sensible, or practical." Thus, the Board affirmed the decision to deny Mahoney's claim for unemployment insurance benefits.

¶9      Mahoney seeks judicial review of the Board's decision.

ISSUES AND STANDARD OF REVIEW

¶10     Mahoney challenges the Board's denial of unemployment insurance benefits on the bases that the Board overlooked material evidence and made factual findings that are not supported by substantial evidence.

¶11     This court's authority to review the Board's decision is derived from the Administrative Procedures Act. Utah Code Ann. § 63G-4-403(1) (LexisNexis 2019). The Act provides, among other things, that we may grant relief if we determine that the Board "substantially prejudiced" a person by not deciding "all of the issues requiring resolution" or by basing its decision upon a factual determination "that is not supported by substantial evidence when viewed in light of the whole record before the court." *Id.* § 63G-4-403(4)(c), (g); *see also Davis v. Department of Workforce Services*, 2012 UT App 158, ¶ 2, 280 P.3d 442; *Benson v. Peace Officer Standards & Training Council*, 2011 UT App 220, ¶ 22,

261 P.3d 643. "Substantial evidence exists where more than a mere scintilla, though something less than the weight of the evidence, supports the Board's findings." *Prosper Team, Inc. v. Department of Workforce Services*, 2011 UT App 246, ¶ 4, 262 P.3d 462 (cleaned up). This is met "when a reasonable mind might accept as adequate the evidence supporting the" relevant findings. *Id.* (cleaned up).

¶12 "A person is substantially prejudiced by an agency action if that challenged action was not harmless." *Foye v. Labor Comm'n*, 2018 UT App 124, ¶ 31, 428 P.3d 26. "An error will be harmless if it is sufficiently inconsequential that there is no reasonable likelihood that the error affected the outcome of the proceedings." *Smith v. Department of Workforce Services*, 2010 UT App 382, ¶ 17, 245 P.3d 758 (cleaned up).

ANALYSIS

¶13 Claimants who voluntarily quit their employment may be entitled to unemployment insurance benefits if they can show "good cause for the separation or if denying benefits would be contrary to equity and good conscience." *Gibson v. Department of Workforce Services*, 2017 UT App 107, ¶ 3, 400 P.3d 1152 (per curiam); *see also* Utah Code Ann. § 35A-4-405(1)(a)–(b) (LexisNexis 2019); Utah Admin. Code R994-405-101(3).

¶14 To establish good cause, a claimant must first "show that continuing the employment would have caused an adverse effect which the claimant could not control or prevent." Utah Admin. Code R994-405-102. An adverse effect exists when the separation is "motivated by circumstances that made the continuance of the employment a hardship or matter of concern, sufficiently adverse to a reasonable person so as to outweigh the benefits of remaining employed." *Id.* R994-405-102(1)(a). This standard requires a showing of "actual or potential physical, mental, economic,

personal or professional harm caused or aggravated by the employment." *Id.* Second, a claimant must also show "that an immediate severance of the employment relationship was necessary." *Id.* R994-405-102. A claimant will not be able to make this showing "if the claimant: (i) reasonably could have continued working while looking for other employment, (ii) had reasonable alternatives that would have made it possible to preserve the job . . . , or, (iii) did not give the employer notice of the circumstances causing the hardship." *Id.* R994-405-102(1)(b).

¶15    Additionally, even if the good cause standard is not met, "benefits may be allowed under the provisions of the equity and good conscience standard if" "there are mitigating circumstances," "a denial of benefits would be unreasonably harsh or an affront to fairness," and the claimant "acted reasonably" and "demonstrated a continuing attachment to the labor market." *Id.* R994-405-103(1)(a)–(b).

¶16    Here, the Board determined that Mahoney "failed to produce persuasive evidence that remaining employed created a hardship outside of his control." Mahoney challenges this determination and the findings of fact that support it. In particular, he attacks findings about returning to same-day turnovers and reopening the welcome center. He also complains that the Board overlooked related evidence that D.H. declined Mahoney's requests to abide by social distancing guidelines in the welcome center and to wear a mask. In other words, Mahoney asserts that there is insubstantial evidence to support the Board's factual findings and thus its ultimate determinations.

¶17    We begin by addressing Mahoney's challenges to the Board's factual findings and conclude that certain of the Board's findings are not supported by substantial evidence and that other material facts were overlooked. We then address whether the Board's errors were material to its decision and thus substantially prejudiced Mahoney.

## I. The Board's Factual Findings

### A.    Same-Day Turnovers

¶18    Beginning in March 2020, based on "research . . . that said that coronavirus can survive in the air for two or three hours," the resort suspended same-day turnovers and instead "required 24 hours in between occupancies." And in May 2020, the resort arranged for a sanitation worker to disinfect the bungalows with a professional grade hospital fogger before the housekeeping staff would be allowed to clean and prepare the units for new occupants. Specifically, the sanitation worker would put on a Tyvek suit, N100 mask, face shield, and gloves, and disinfect the rooms in the evening so that the housekeeping staff could return in the morning and "feel safe and comfortable that [Employer was] eliminating exposure for them."

¶19    In late May 2020, Employer insisted that Mahoney "return to same-day turnovers." Mahoney thought this decision was "irresponsible." He testified that as same-day turnovers increased, the responsibility for disinfecting bungalows "would fall more and more on" him instead of the sanitation worker. Mahoney explained he did not want to disinfect the units "moments after" guests left, nor did he "want to have to order someone to do that." Despite Mahoney's concerns, Employer implemented the change.

¶20    In support of his claim for benefits, Mahoney asserted that this change in policy created a hardship for him. But the Board disagreed. It found that his concern that he would be placed "at an unreasonable risk of infection" by having to enter a bungalow "soon after a guest checked out" was unconvincing because Employer "provided extensive protection to the workers as they cleaned the rooms, including N100 masks and Tyvek suits." And "[g]iven such protection," the Board found that Mahoney "did not

persuasively show that he or other workers were significantly placed at risk by entering a room to fog it."

¶21 Mahoney challenges these findings as unsupported by substantial evidence. He argues that the Board "made an incorrect assumption about the availability and prevalence of proper [personal protective equipment]," explaining that Employer did not provide multiple Tyvek suits and other protective equipment for its employees. Rather, Mahoney asserts that he provided a singular Tyvek suit, N100 mask, and face shield from his own "personal supply."[5]

¶22 We agree with Mahoney that the Board made an incorrect assumption about the availability of protective equipment necessary for the disinfecting of the bungalows. Mahoney testified that the sanitation worker used a N100 mask, Tyvek suit, face shield, and a disinfectant fogger, and that Mahoney himself put on the equipment when he filled in for the sanitation worker on one occasion. But there is no evidence in the record that Employer provided multiple face shields, Tyvek suits, and foggers, or that the equipment was generally available to all employees. Thus, there is an absence of support in the record for the Board's finding that with the return to same-day turnovers, Mahoney and his staff would have "extensive protection" as they prepared the rooms for new guests.

---

5. There is a lack of clarity in the record about *who* provided the protective gear worn while disinfecting the bungalows. Mahoney argues that he provided the equipment from his own personal supply, but Mahoney did not testify to that during the hearing before the ALJ. Thus, we cannot fault the Board for finding that Employer (rather than Mahoney) provided this equipment.

B.     The Welcome Center

¶23    Mahoney next challenges the Board's findings that with the reopening of the welcome center in June 2020, Employer "planned to enforce social distancing guidelines in the center" and arranged "to install plexiglass shields in between the guests and the front-desk employee." In challenging this finding, Mahoney contends that the Board neglected to acknowledge that the welcome center was going to be reopened without the plexiglass installed and that far from enforcing social distancing guidelines, D.H. himself was dismissive of Mahoney's requests that D.H. wear a mask and socially distance during their interactions. Mahoney's complaint is well taken.

¶24    While the Board's findings are not inaccurate on their face—Employer did plan to enforce social distancing guidelines in the welcome center and install plexiglass shields between its employees and guests—the Board failed to account for the current and immediate risk to Mahoney from guests and Employer alike. Specifically, when asked "what was unsafe about" reopening the welcome center, Mahoney testified that not having plexiglass in place before reopening impelled his resignation because he would be "forced to have . . . face-to-face unmasked contact with guests and . . . [the] owners." This concerned him because guests came "from all over the country including places that still had stay-at-home orders in effect and . . . places that were considered hot spots for COVID." Mahoney explained that without the plexiglass shields in place, he was concerned about his safety, the safety of his employees, and the safety of his wife, who "is considered a high-risk person." Further, Mahoney testified that he felt unsafe because, regardless of whether Employer intended to display signage encouraging social distancing among the guests, Employer was not abiding by the recommended guidelines. In particular, D.H. visited with Mahoney "on an almost daily basis" but refused to wear a mask or socially distance.

¶25    Unfortunately, the Board made no findings on these issues, which Mahoney testified drove him to resign. Instead, the Board focused on the precautions Employer anticipated taking regarding the welcome center, but it did not address Mahoney's complaints that Employer insisted on opening the welcome center without these precautions in place and that D.H.'s daily interactions with Mahoney were inconsistent with Employer's stated intentions. And while it is possible that the Board did not credit Mahoney's testimony on these points, there is nothing in the record to suggest that is the case. Neither the ALJ nor the Board suggested that they found Mahoney not credible; indeed, his testimony was supported, in part, by contemporaneous emails, and there was no rebuttal on these points by Employer.

## II. The Board's Analysis

¶26    To demonstrate that he was entitled to unemployment insurance benefits, Mahoney was required to show good cause for his separation or that denying him benefits would be contrary to equity and good conscience. *See Gibson v. Department of Workforce Services*, 2017 UT App 107, ¶ 3, 400 P.3d 1152 (per curiam). Mahoney attempted to meet his burden by showing that his health (and the health of his wife) was at risk because of the decisions made by Employer. He complained that Employer was reinstating same-day turnovers, requiring him (and others) to clean rooms without sufficient time to sanitize them. He also complained that he would be required to interact with out-of-state guests before appropriate precautions were in place with the reopening of the welcome center. And he complained that, despite Employer's assurances that it would enforce social distancing guidelines in the welcome center, D.H. interacted with Mahoney daily while refusing to wear a mask or socially distance.

¶27    The Board ultimately determined that Mahoney did not meet his burden and "did not show he was placed at an unreasonable risk of infection in the workplace." But the Board

made that determination based on at least one factual finding that was unsupported by substantial evidence and without addressing two of Mahoney's chief complaints. Specifically, as discussed above, the Board erroneously determined that "Employer provided extensive protection to the workers as they cleaned the rooms." *See supra* ¶¶ 20–22. Further, in finding that Employer intended to install plexiglass shields and post floor signage encouraging social distancing in the welcome center, the Board failed to address Mahoney's complaint that the welcome center would reopen without the plexiglass installed and that D.H., the manager of the owner organization, would not wear a mask or socially distance when interacting with Mahoney. *See supra* ¶¶ 23–25.

¶28 We conclude that Mahoney was prejudiced by the Board's unsupported factual determination and its failure to address all the issues presented. Each of these complaints were material to Mahoney's resignation and therefore relevant to the question of whether Mahoney is entitled to unemployment insurance benefits under either the good cause or the equity and good conscience standards. Thus, there is a reasonable likelihood that but for the Board's errors the outcome of this proceeding would have been different. *See Smith v. Department of Workforce Services*, 2010 UT App 382, ¶ 17, 245 P.3d 758. We accordingly set aside the Board's decision and remand this matter for a full consideration of Mahoney's complaints.

CONCLUSION

¶29 The Board made at least one factual finding lacking substantial evidence, and it declined to address two of Mahoney's complaints. In our view, these errors were significant enough to perhaps have made a difference to the outcome. Accordingly, we set aside the Board's decision and remand this matter to the Board for reconsideration.